Good morning. May it please the Court, Tim Wilborn, Rep. Carol Page. One thing I can tell you is what the definition of full-time work is under the Social Security Act. It's eight hours a day, five days a week, or an equivalent schedule, and that's critical here. Actually, ironically, because the claimant's treating physician, Dr. Moore, found that the claimant had to lie down for one of those eight hours a day. Now, opposing counsel has argued in their brief that she can simply lie down during her lunch hour. Well, that argument must fail here because this case was decided at step four of the sequential analysis, and at step four of the sequential analysis, the inquiry is whether the claimant can return to past relevant work as performed. No, she did not get to lie down during her lunch hour. Or can she return to past relevant work as generally performed in the national economy? And there is no evidence in the record that administrative clerks and office managers get to lie down for an hour during lunch. I think common sense dictates quite the opposite. And so if Dr. Moore's opinion is accepted, then this case must at a minimum be reversed and remanded for further proceedings to proceed on to step five of the analysis, because we have shown that she can't perform her past relevant work either as she performed it or as it is generally performed in the national economy. So let's move on to, I think, what the Court is a little more concerned about, based on the order for supplemental briefing. And that is, what is the standard for a doctor's opinion being supported by objective evidence? I'm going to refer to the statute, which opposing counsel excerpts in their supplemental brief. And the statute says that an individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability, as defined in this section, there must be medical signs and findings established by medically acceptable clinical or laboratory diagnostic techniques which show the existence of a medical impairment. So to meet the threshold of proving that you have a medical impairment, you have to show more than just my back hurts. Well, she undoubtedly has here. Even the ALJ found that she has a severe impairment. And so there's no question that she's met the threshold. But then the statute goes on, and this part is italicized in the excerpt of the statute in the commissioner's supplemental brief, and it says that once you've crossed that threshold, the agency must consider all evidence, including the subjective analysis, you know, of the doctors and the subjective reporting of the claimant. And so what happens here is you go to the case that the court requested that we address in supplemental briefing, which is the Ryan case. In the Ryan case, this court focused extensively on the distinction between fully supported by, as a phrase, I'm not sure the court actually used that term, but that's the concept. There's a distinction between fully supported by versus consistent with. And in the line of precedential cases dating all the way back to Embry and probably before, Embry, I think, came out in 1988. We've got Smolin, which set forth the cotton test. Lester also applying a similar standard. More recently, Ryan. All these cases deal with this analysis that once you show that you have an impairment, then the subjective reporting of the claimant has to be considered in determining the severity of the impairment. And in the Embry case, which opposing counsel has tried to distinguish based on the facts, I don't think the distinction makes a difference. The holding of the Embry case was that it was an error for the ALJ not to consider the subjective judgments of the long-term treating physician. The same applies here. Dr. Nowar, the long-term treating physician, gave a residual functional capacity which was not fully adopted by the administrative law judge. Can we get down to brass tacks on this one? The ALJ seems to attach enough weight to the testimony of Dr. Goodman to override the opinion to the other doctors. Why was the ALJ wrong in relying on Dr. Goodman's view? Well, I'm not sure what Dr. Goodman said that supports the ALJ's conclusion. Dr. Goodman testified that the claimant doesn't need a listing. Well, you don't have to meet a listing to be disabled under the Social Security Act. You're presumptively disabled if you do. But Dr. Goodman also went on to testify that she has an enormous amount of discomfort. That's on transcript 342. So Dr. Goodman didn't question that this woman is in excruciating pain. No, he said enormous amount of discomfort. Excruciating pain is a different word or a different phrase. Well, I believe that if you look at her subjective reporting, excruciating pain pretty well describes it. He didn't disagree with that. I think what he said, he says clearly the story that Mrs. Page tells us is that she has enormous amount of misery and pain in the back area. He's describing what she said. That's at 341. And he does not disagree with it. And then he goes on to say, you know, he has a philosophical or medical difference with... And so to repeat, she has an enormous amount of discomfort that's making her miserable. And then he says, but she does not have anatomical impairment of the muscles or ambulation. I've got a slightly different question with respect to Dr. Goodman. As far as I can tell, and this is his own description of his own qualifications. I'm on page ER 341. He's not a back expert. His practice before he became semi-retired was internal medicine on diabetes. And he never examined her, correct? He never examined her. So he's never seen her except maybe sitting in the courtroom. Exactly. So he looks at pictures and reports. He looks at pictures and reports. He does not examine her. He's not a specialist in backs. And the ALJ relies on him. I believe that's absolutely correct. And if I may reserve the remaining two minutes, I would like to. Okay. Good morning. Stephanie Martz on behalf of the commissioner. The information in the record as a whole is consistent with the ALJ's findings. And this goes to Dr. Moore's opinion, which I think is critical here in the sense that she stated that she believed that Ms. Page was capable of performing sustained work activity, both at the light level and at the sedentary level. So there is information in the record. She's the one who said there had to be a line down for an hour? And she didn't specify when that hour needed to occur. And I disagree with Appellant's argument. A vocational expert stated, and this is at page 352, that an hour of laying down during the day during the lunch hour would be permissible. So the information from that. Wait a minute. Usually you get an hour for lunch. And are you suggesting that she's supposed to lie down and eat her lunch lying down every day? She could. Oh, well. We all can. Now she'll have gas or enteritis. The other thing I could say is that. . . Better not have soup. That's true. You probably couldn't. But she. . . The hour to lie down during the day could have occurred. First, Dr. Moore didn't say it needed to be a consecutive hour. She could have done it in increments. You have to look at what Dr. Moore said as a whole, which was that she could sustain work eight hours a day, five days a week. And that is Dr. Moore's opinion. So the sustainability is from Dr. Moore. The other part is that Mr. Wilborn has talked about as far as what is objective findings and how much support does a medical opinion need to have. And I suppose we could talk at great length to what degree that would need. But in this particular case, the medical evidence was far from conclusive as far as what the doctors all agreed. And going back to Dr. Goodman, Dr. Goodman said he did believe that she testified that she had a lot of pain and misery. He did more than that. I mean, that's what he started out saying, as Judge Fletcher said. At ER 34, he said, but my intuitive feeling is that they are limiting her activities based on pain, not on anatomically. He doesn't, and then the question is, but does the pathology she has, would that reasonably generate the pain she is reporting? And then he goes on to say, well, that depends on whether you buy into this notion that 70% of the country has facet disease and so on and so forth. It's not clear to me he is discounting her pain. He's just quarreling with whether it is tied to the disease that they've diagnosed. And he has a medical difference of opinion. He does. So is his medical difference of opinion supposed to override the assumptions of two doctors who are documenting an organic condition? He's not challenging the organic condition. He is just saying, I'm not sure I would give it, you know, and she has this pain, but I'm not sure it's all attributable or what percent is attributable to the organic condition. Right. He says the degenerative disc disease wouldn't be compatible with the pain she's reporting and that he doesn't buy into this concept of facet disease that would be causing pain. His opinion is consistent with Dr. Andrews' opinion, who treated Ms. Page for several months in the summer of 2001, who stated on several occasions that the etiology of her pain was unclear. And he was somebody that Dr. Moore sent Ms. Page to Dr. Andrews. Didn't Dr. Moore, didn't she examine in 2005? Dr. Moore examined her in 2001 and again in 2005. Yeah, she says, I haven't seen the patient for four years, and now she's come in. So she's opine now post-Dr. Andrews, right? Right, but her condition hasn't changed. And so Dr. Goodman's opinion is consistent with Dr. Andrews', which was there wasn't a consensus within the doctors that treated her as to what was causing the amount of pain that she was describing, that the amount of pain she described was not consistent with the objective findings. And Dr. Goodman, that was Dr. Goodman's opinion, which the ALJ relied on. That opinion is consistent with Dr. Andrews' opinion. I have to say, I read Dr. Goodman's testimony. I found it, to state it gently, less than persuasive. I took into account his qualifications, which don't have anything to do with doctors, and I read his general statements, just a kind of a, if you buy into this, if you buy into that, the chiropractors seem to think that. I mean, medical doctors hate chiropractors. I mean, there was just nothing there. He is consistent with Dr. Andrews, who did treat her, did see her, did prescribe medication, and said that her pain wasn't, he couldn't determine what the source of her pain was. It wasn't accounted for by the objective findings that he saw. And that is consistent. Well, Dr. Moore says diagnostic study, she looked at a MRI, I think it was an MRI, she obtained from the server on April 2004. This does show she has increased degeneration above her fusion. And then she makes her diagnosis and recommendation. And her recommendation is that she can perform sustained work activity, eight hours a day, five days a week, at the light level and at the sedentary level. If she can lie down. If she could lie down during the day, which the vocational expert stated that she could. Ms. Page testified that the worst thing for her was sitting, and the vocational expert testified that if she needed to reposition herself, every few minutes that she could still perform her past relevant work as it's generally performed. She was an office manager? There were several jobs. Administrative clerk? There was the administrative clerk job and the office manager job were the two that the vocational expert said she could return to because there was enough change in position in the day that that could be accommodated. So if she couldn't lie down for, in other words, if it would really, I mean, theoretically you can lie down during your lunch hour as a practical matter. What's the evidence as a practical matter? I mean, we started out with a bit of humor on that, but it's not really humorous. The idea is because the VE says she won't have, she couldn't do it if she doesn't have the, I forget the word, it can't be at her discretion. She's going to have to do it at the employer's discretion, so it would probably have to be the lunch hour. Isn't that right? Right. You couldn't arbitrarily choose the hour, as the vocational expert stated. So the theory is that she can work, but she will have to use an hour in the middle of the day to lie down and relieve her back pain. And the vocational expert stated that there were jobs that would allow that, and that's the expert here. And the ALJ could rely on that. This is a reasonable interpretation of the evidence. It doesn't have to be the only interpretation of this evidence. It just needs to be a reasonable one. And the ALJ's findings are largely consistent with the treating doctor, with Dr. Moore, who said she could perform sustained work. It's consistent with her treating doctor, who said she couldn't perform a job that required sitting all day. His findings are consistent with Dr. Noah's opinion that she could be able to shift positions every several minutes, which is what Dr. Noah stated. The ALJ's findings are consistent with the medical evidence. This is not a case like Embry, which an appellant raises. In Embry, the claimant had pulmonary problems. He was taking oxygen 24 hours a day. He needed to have the oxygen tank with him. He'd been hospitalized on several occasions during this period for pulmonary problems. He was obese. He had diabetes and had foot ulcers. And did the commissioner oppose a ward of benefits with him in that terrible condition? They didn't, no. And I can't explain that, but I can explain this. You say they did oppose? The commissioner did oppose benefits? Yes. Which this court reversed. But to rely on Embry to state that this is somehow the holding in Embry shows that there's some fault here with the ALJ. In Embry, there were four doctors who stated couldn't work. The ALJ's findings were completely opposite of that. And in this case, the ALJ's findings are consistent with the medical opinions. And this finding that she can do her past relevant work is consistent with Dr. Moore, consistent with Dr. Nowher, consistent with Dr. Goodman. Okay. Can I ask a question that's, I think, not really related specifically to this case? I notice that we've got an awful lot of social security disability cases on this calendar, and I've heard that, in fact, the Oregon calendars are having a lot of social security cases, much more than we're getting in any other district. Is there some reason for that? I think Mr. Wilburn could probably answer that question better than I could. We might ask him to. But this is not out of your argument. I'm just interested independently as to what's happening here. I don't know for sure. I mean, I would agree with you that I would say that, you know, our office deals with cases out of Oregon, Washington, Idaho, and Alaska. And Oregon is our, by far, our busiest jurisdiction. You get lots of trips to Portland. It feels like it. And there probably are more Oregon cases. I think I see Mr. Wilburn's name more than anyone else's. You know, just there's the volume of cases, and I'm not really, I don't know if it's the difference of people. I think there's more attorneys here in Oregon that practice this area of law than perhaps in some other places. They're definitely more aggressive. They bring more cases. But I don't know if it's just because there's more to bring or if, I mean, I don't. And I don't know specifically as to these states. I do know that there's some variation. I mean, we have studies. There's some significant variation in award, and I'll call it generosity, for want of a better word, from state to state. I mean, there are lots of studies that show, you know, some states award benefits relatively easily. There are probably some states with some, you know, real hesitancy. So that may be another factor. Is that possible? There's that. I think there is not consistency in how the circuit court case law is. I would say that cases in other parts of the country have less success rate in court than perhaps the ones we do here. I mean, that's just anecdotally. I don't know. I mean, that's just my gut feeling on that. We'll have to do a regression analysis. Okay. Well, thank you for that. I don't want to detain you too long on that question. Thank you. Mr. Wilborn, don't answer that general question. Stick with your clangor for a while. I think the opposing counsel has made a glaring misstatement about what the VE actually did testify. The VE did not testify that this woman could lie down on her lunch break. At transcript 353, the VE testified. The question ALJ says, and would these jobs be eliminated if you needed to recline for an hour during the day? And the VE said, unless you could do it during your lunch hour. And so the VE then follows up and says, most offices give you an hour for lunch, but didn't say that she could lie down during that hour. And as I came out and started my argument with the proposition that in her prior work, she didn't, in fact, get to lie down for an hour, nor do most places of employment allow that for an hour. And so I think you have to examine that testimony very carefully. At transcript 314, Dr. Moore said that the claimant must lie down for one hour per day. And if you look at the heading of the section where she indicated that opinion, it says total combined capacity to perform the designated hour or designated activity during the entire eight-hour workday. So if you have an eight-hour workday that has a one-hour lunch, that lying down during the lunch is outside the workday. But Dr. Moore didn't say that this claimant could perform eight hours of work and then lie down for some ninth hour in between. She said she has to lie down for one of the eight work hours. Critical distinction here. Well, yeah, okay. I also noticed that the ALJ, I'm just reading the ALJ now. I'm on page 4 of 7 of the AGS ER 23. At the end of the paragraph describing Dr. Moore's opinion, the report, as Dr. Moore's report, is consistent with the evidence. It's given a substantial weight in general. But then the ALJ says, but the claimant's need to lie down for an hour during the day is not consistent with any examination reports. So I'm not sure whether the ALJ buys off on that. It sounds to me that the ALJ says, I don't believe that part of it. Well, I think here we go back to the point that this Court addressed in the Ryan case. There's a huge difference between fully supported by and proven by versus consistent with. And we've met the threshold of consistent with, and so then you have to rely on the doctor's subjective assessment. And I think the ALJ has committed a legal error here by insisting that the standard be fully supported by as opposed to consistent with. The ALJ is calling it the wrong thing. And I have to say, and then I then go on to the next paragraph where Dr. Goodman's testimony is considered, where the ALJ gives a quote some weight and says it suggests the claimant's limitations are only minor. But then the ALJ goes on to say, however, Dr. Moore has treated the claimant, and her particular assessment seems reasonable. Well, I've got two sentences ending two separate paragraphs. I guess it's just an intervening paragraph that seem to me inconsistent. I don't know what the ALJ is telling us. I think what the ALJ is telling us is that she didn't read Dr. Moore's assessment very carefully before purporting to adopt it. That may be right. Or the ALJ forgot what the ALJ had written two paragraphs earlier about saying, well, I don't actually believe the need for one hour. I mean, I don't know what's going on. Well, I think the contradictions in the ALJ's decision. I think that sounded like a rhetorical question. Yeah. It has to be remanded. And the question is whether to pay it or remand it for further proceedings. Okay. Thank you very much. Oh, I'm sorry. Now, could I ask, do you have a view as to why we're getting so many of these cases in Oregon beyond the skill of your advocacy? There are certain administrative law judges in Oregon who have a lower pay rate than the national average. And five of them have retired in the last six months or moved to other jurisdictions, and so I'm a little worried about my job security at this point. Okay. Okay. Thank you both for your arguments. The case of Page v. Astor has been submitted for decision. The case of Widman v. Astor has been submitted on the briefs. And the last case on the argument calendar and the last case on the calendar, Cardi v. Astor.
judges: Fletcher, Fisher, Breyer